**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Janet Rolandson,

     Plaintiff,

v.

Ethicon, Inc. and
Johnson & Johnson,

     Defendants.

Case No. 15-cv-537 (ECT/DTS)

**ORDER**

## INTRODUCTION

After this lawsuit returned from the Ethicon pelvic repair products multidistrict litigation, this Court issued a short scheduling order addressing the limited remaining discovery identified and agreed to by the parties. Plaintiff Janet Rolandson subsequently served three reports from two previously undisclosed experts for this case. She also served a supplemental report from Dr. Geoffrey Towers, a previously disclosed expert who reportedly removed a piece of mesh when he examined Rolandson, but who failed to preserve the excised material.

In the present motion, Defendants ask the Court to strike each new report in its entirety and to strike portions of the Towers supplemental report. Because the new reports patently violate an applicable case management order, the Court will strike the two new reports in their entirety. Further, because Defendants are prejudiced by Dr. Towers's failure to preserve the piece of the mesh he purportedly removed, the Court will strike all portions of Dr. Towers's supplemental report discussing his observation of mesh exposure and any subsequent removal and identification of the material. Because this motion should have been unnecessary, Defendants are awarded a portion of their costs and fees incurred in responding to the motion.

**FACTS[1]**

**I.     The Initial Expert Disclosures and this Court's Scheduling Order**

Rolandson sued Defendants in this District in February 2015, alleging that two previously implanted pelvic mesh devices marketed by Defendants had caused her serious injury and significant pain. *See generally* Compl., Dkt. No. 1. Barely two weeks later, this case was transferred to the multidistrict litigation regarding Ethicon's various pelvic repair products, which was assigned to the Southern District of West Virginia. Conditional Transfer Order (CTO-159), Dkt. No. 6. Rolandson's case became part of a wave of cases, which the MDL court labelled "Wave 8," that proceeded together through the MDL. Decl. of Tracy J. Van Steenburgh ¶ 2, Ex. A (MDL Pretrial Order # 303), Dkt. No. 20.

A few months after Rolandon's case was transferred, the MDL court, based upon a stipulation between Defendants and lead plaintiff's counsel, issued an order setting the "protocol for preservation and testing of explants and tissue samples taken from plaintiffs." *Id.* at Ex. O. The court recognized that purported mesh material removed from plaintiffs "are potentially unique and important evidence" in the individual cases and so made the protocol applicable to all cases in the MDL. *Id.* at Ex. O, ¶¶ 1-2. The order thoroughly addresses what plaintiff's counsel must do to ensure excised material is preserved, whether they learn about the excision before or after the fact. *Id.* at ¶ 4.

Over the next several years, the MDL court shepherded thousands of individual cases through their pretrial proceedings.  In 2018, it set much of the discovery timeline, including expert disclosure deadlines, for the Wave 8 cases. Relevant here, plaintiffs

---

[1]The Court has included a timeline of the relevant facts, Attachment A to this Order, to assist the reader.

were obligated to disclose their initial experts by July 13, 2018, and any rebuttal to defendants' experts by August 20, 2018. *Id.* at Ex. A, at § A ("Pretrial Order #303"). The MDL court also recognized "the likelihood of overlap in expert opinion from one case to another (except as to specific causation)[,]" and limited each party to five experts, exclusive of treating physicians. *Id.* at Ex. A, § A, ¶ 3.a.

Rolandson timely disclosed five experts, including Dr. Geoffrey Towers. *Id.* at Ex. B. In her disclosure, Rolandson reserved the right to "elicit testimony, either through direct examination or cross-examination" of another, already disclosed, general expert if one of the general experts she designated was unavailable to testify at her trial. *Id.* She also acknowledged that "[i]n no event, however, will Plaintiffs' [sic] retained experts at trial exceed five (5) experts without leave of Court for good cause shown."[2] *Id.*

After the coordinated pretrial proceedings in Wave 8 were complete and the JPML had transferred Rolandson's action back to the District of Minnesota, this Court held a status conference to come up to speed on the case and to chart a path forward. The Court asked the parties what, if any, additional discovery remained. Status Conference Tr., Aug. 27, 2019, at 4. Plaintiff's counsel, Ms. Baldwin, acknowledged that both general and case specific reports had been served, but stated she wanted an expert to perform an independent medical examination of Ms. Rolandson. *Id.* Defendants' counsel also expressed an interest in additional discovery, namely the chance to take the deposition of one of Rolandson's treating physicians and possibly

---

[2] Another attorney at Kline and Specter, not Ms. Baldwin, signed the expert witness disclosures. Although it is not this Court's practice to refer to counsel by name, the Court does so here to delineate clearly actions attributable solely to counsel, rather than to the Plaintiff herself.

friends or family members. *Id.* at 5. Neither party, certainly not Plaintiff's counsel, indicated that new experts would be disclosed. *See generally id.*

Based upon the parties' representations at the status conference, this Court issued a one page order setting the remaining deadlines in the case. Order, Sept. 10, 2019, Dkt. No. 16. That order noted the limited discovery remaining: "expert medical examinations and depositions of certain medical experts, family, and friends of Plaintiff's." *Id.* Per the Order, this limited remaining discovery was to be completed by December 31, 2019, and the case ready for trial by April 6, 2020. *Id.*

## II.   The New Expert Reports

### A.   Dr. Elliott

The parties initially agreed to a timeline for the remaining discovery. *Id.* at Ex. C, 3-4. According to Ms. Van Steenburgh, Plaintiff's supplemental report, an IME by Dr. Towers, was due by October 31 and Defendants' supplemental report by their case specific expert was due November 27. *Id.* at Ex. C, 3. However, Ms. Baldwin emailed Ms. Van Steenburgh on October 29, saying she could not find the email in which they had agreed to certain dates and suggesting she could serve "P reports" by November 15. *Id.* at Ex. C, 4. Ms. Baldwin followed up the next morning, suggesting November 22 for "P's supplemental reports" and December 13 for "D's supplemental reports," and any expert depositions be completed by December 21. *Id.*

Ms. Van Steenburgh responded to Ms. Baldwin's proposal and noted her concern about the shortened time Defendants' expert would have to produce a report, thereby beginning the inevitable back-and-forth regarding dates. *Id.* Responding to a subsequent email in which Ms. Baldwin again referred to "P's reports," Ms. Van Steenburgh asked if Ms. Baldwin intended "to update other reports that have already

4

been served in this case?" *Id.* at Ex. C, 1-2. Ms. Baldwin responded, "We may have more than 1 supplemental, I haven't taken dep yet and our IME isn't done yet so I can't say." *Id.* at Ex. C, 1. Ms. Steenburgh sought clarification as to whether Ms. Baldwin intended to add a new expert or serve several supplements to the expert reports already served in the case. *Id.* Ms. Baldwin replied, "I will serve whatever reports I deem necessary." *Id.*

A week after this exchange, Ms. Baldwin served Defendants with an entirely new general expert report by Dr. Daniel Elliott. *Id.* at Ex. D, Ex. E. Although the report was signed, it was not dated. *Id.* at Ex. E, 62. In the accompanying letter, Ms. Baldwin stated the report "was inadvertently not produced during the MDL workup of this case." *Id.* at Ex. D. Ms. Baldwin did not propose in her letter substituting Dr. Elliott for one of the previously disclosed experts. *Id.* Md. Baldwin also noted that "[s]upplemental reports will still be served by the agreed upon November 22, 2019 date." *Id.*

## B.    Dr. Margolis and Dr. Towers

While the events of Dr. Elliott's disclosure played out, discovery continued on other fronts. Defendants noticed the deposition of Dr. Eric English, Rolandson' treating physician who had removed a piece of mesh prior to her lawsuit, for November 12, 2019. *Id.* at ¶ 8; Hr'g Tr., Jan. 31, 2020, at 13, Dkt. No. 63. A week before the deposition, Ms. Baldwin provided new medical records to Defendants that showed Dr. English saw Rolandson for possible mesh erosion[3] on September 10, 2019, four years after the previously last known visit. Van Steenburgh Decl. ¶¶ 9-10, Ex. F. According to

---

[3] In this Order, mesh erosion means the mesh material has gone through the vaginal tissue and become exposed. Hr'g Tr. 18. Although some medical experts distinguish the terms mesh erosion and mesh exposure, this Court uses the terms interchangeably, as the experts in this case have done. *Id.* at 18-19.

these records, Rolandson informed Dr. English that a "specialist" in San Francisco had identified the possible erosion, although Dr. English found no erosion during his examination. *Id.* at ¶ 10.

Because Defendants did not have any medical records from a specialist in San Francisco, Ms. Van Steenburgh sent a letter to Ms. Baldwin on November 6, seeking more information about this "specialist." *Id.* at ¶ 11. Ms. Baldwin responded by letter the next day. The body of that letter states, in its entirety, as follows:

> I am in receipt of your letter dated November 6, 2019. Please be advised our client did not see a treater in San Francisco, and she has not seen any treaters who have not been disclosed. I am unaware as to what the documentation regarding JNJ sending her anywhere refers to or what the reference to the requirement for a lot of records is about."

*Id.* at Ex. G.

On the day of Dr. English's deposition, Ms. Van Steenburgh ran into Ms. Baldwin shortly before the deposition. *Id.* at ¶ 12. Ms. Baldwin informed Ms. Van Steenburgh that her firm had sent Rolandson to San Francisco to see Dr. Margolis, during which examination Dr. Margolis had noted a mesh erosion. *Id.* Rolandson subsequently saw Dr. Towers, who excised the erosion, so it "made sense" that Dr. English had not noted mesh erosion when he later examined Rolandson. *Id.* Ms. Van Steenburgh asked when these various examinations had occurred, but Ms. Baldwin responded that she had only learned this information that morning and did not know more. *Id.* Following Dr. English's deposition, Ms. Van Steenburgh again asked about these newly discovered examinations and Dr. Towers's excision of allegedly exposed mesh. *Id.* at ¶ 13.

Ms. Baldwin again stated she had only learned about it that morning and offered to present Dr. Towers as a witness for deposition.[4] *Id.*

Two days after Dr. English's deposition, Ms. Van Steenburgh followed up with a letter to Ms. Baldwin seeking additional details about the examinations conducted by Dr. Margolis and Dr. Towers.

> (1) On what date(s) did Ms. Rolandson consult with Dr. Margolis in San Francisco?

> (2) At whose behest and for what purpose did Ms. Rolandson see Dr. Towers before the office visit with Dr. English?

> (3) On what date(s) did Ms. Rolandson see and/or was treated by Dr. Towers?

> (4) What steps has your firm taken to preserve any tissue specimens, mesh, or other material excised by Dr. Towers? Where is the evidence currently?

*Id.* at Ex. H. Ms. Van Steenburgh's letter also addressed recently served a new general report of Dr. Elliot, seeking confirmation "that Plaintiff does not intend to include Dr. Elliott as an expert in her case." *Id.* Eight days later, Ms. Baldwin responded to the letter by email, stating she had talked to Dr. Towers, and learned his excision occurred "after [Rolandson] saw Dr. English, not before." *Id.* at Ex. I. She also affirmed her intent to use Dr. Elliott as an expert at trial and that she would send "supplemental reports" due that day the following week because she "had something come up here and just can't do it today." *Id.*

---

[4] Because Ms. Baldwin did not provide any sworn statement regarding her conversation with Ms. Van Steenburgh that day, this Court credits Ms. Van Steenburgh's recitation of the events in her declaration. However, Ms. Van Steenburgh's sworn statement is also largely consistent with Ms. Baldwin's unsworn narrative set out in Plaintiff's brief, aside from characterizations of the events.

Ms. Van Steenburgh responded to Ms. Baldwin's email the same day, asking Ms. Baldwin to respond directly to the questions posed in her prior letter and suggesting that someone else at Ms. Baldwin's firm could send Dr. Towers's supplemental report if Ms. Baldwin was too busy. *Id.* at Ex. J. Ms. Van Steenburgh also asked to meet and confer as to whether Rolandson was entitled to designate new general and case specific experts at that point in the litigation. *Id.*

Four days later, Ms. Baldwin served two reports, one general and one case specific, authored by Dr. Margolis, as well as the anticipated supplemental report by Dr. Towers. *Id.* at ¶ 17. Dr. Margolis's case specific report was dated November 25, 2019. *Id.* at Ex. M. Dr. Towers's report, which Ms. Baldwin had previously said she could not transmit on November 22 because something had come up, was dated November 26, the same day as Ms. Baldwin's letter serving the reports. *Compare id.* at Ex. K *with id.* at Ex. M.

In her letter, Ms. Baldwin affirmed Plaintiff's intent "to use both of these experts at trial, including all of their expert reports served upon [Defendants] in this case, in addition to Dr. Elliott[.]" *Id.* at Ex. K. In response to Ms. Van Steenburgh's question about the timing of the disclosures, Ms. Baldwin wrote that she saw no prejudice to Defendants, "as a trial date has not been set." *Id.* She further took the position that "the Court's order dated September 10, 2019 states all discovery shall be completed by December 31, 2019, with no limits on expert reports or designations, and no discussion on any such limitations made by you during our conference with the Court." *Id.*

The newest case specific reports by Dr. Margolis and Dr. Towers finally clarified the timeline of events that had vexed Defendants. Dr. Margolis examined Rolandson on June 25, 2019, before this Court held a status conference and issued its Scheduling

Order. *Id.* at Ex. M, 1. His report states he observed "an extremely small erosion of the mesh" during that examination. *Id.* at Ex. M, 3. This examination and Dr. Margolis's observation of exposed mesh were not disclosed at the Court's status conference.

Dr. Towers examined Rolandson on October 22, 2019, after she had been examined by both Dr. Margolis and Dr. English. *Id.* at Ex. N, 1. Dr. Towers states he saw a small erosion of mesh, which he removed during the examination. *Id.* at Ex. N, 2. He opines that the removed mesh "may have been Prolift mesh," one of the two Ethicon products Rolandson had implanted. *Id.* Rather than follow the detailed and specific procedure set forth in the MDL court's preservation protocol, "Dr. Towers did not retain the mesh he excised . . . ." *Id.* at Ex. K.

## III.    The Motion Hearings

The Court first scheduled arguments on this motion for January 7, 2020. Notice of Mot., Dec. 10, 2019, Dkt. No. 18. Two attorneys for the Defendants were present, but no one representing Plaintiff appeared or otherwise contacted Chambers to explain their absence. Hr'g Minutes, Jan. 7, 2020, Dkt. No. 39. The Court therefore concluded Rolandson had withdrawn her opposition and granted Defendants' motion in its entirety, but gave Rolandson thirty days to show good cause why the hearing should be reopened. Order, Jan. 7, 2020, Dkt. No. 40.

Ms. Baldwin subsequently moved to reopen the hearing, attributing her non-appearance to "an inadvertent calendaring mistake," although she did not submit either an affidavit or declaration swearing to that fact or explaining it. Pl.'s Mem. Law in Supp. Mot. Reopen Hr'g on Defs.' Mot. to Strike 2, Dkt. No. 43. Despite not finding good cause for Ms. Baldwin's conduct, the Court reopened the hearing so Plaintiff could be heard on a motion significant to her case. Order, Jan. 15, 2020, Dkt. No. 51; Hr'g Tr. 26.

9

As an officer of the Court, Ms. Baldwin proffered new information during the reopened motion hearing. She stated, as to Dr. Elliott, she had not been involved with the discovery workup in the case and realized only during her preparation for Dr. English's deposition that another expert, Dr. Rosenzweig, had been designated. Hr'g Tr. 29-30. Although Dr. Rosenzweig's had an expert report on one of the two mesh devices at issue, Ms. Baldwin realized she was without a general expert report on the Prolift, which is the larger device Rolandson had implanted, and so served Dr. Elliott's report on the Prolift. *Id.* at 30. Ms. Baldwin acknowledged that Ms. Van Steenburgh asked if Plaintiff intended to withdraw one of her experts, but stated she was unaware of the MDL court's order, applicable to all Wave 8 cases, limiting each side to five experts. *Id.* She offered no explanation why, upon learning of this apparent inadvertence, she did not contact Defendants' counsel for a meet and confer to possibly amend the scheduling orders or otherwise deal with the matter forthrightly. *Id.* at 31-34.

The Court also heard new details regarding Dr. Margolis's two expert reports. When Ms. Baldwin spoke to Rolandson after becoming personally involved in the case, Rolandson informed Ms. Baldwin that she was in pain. *Id.* at 42. Ms. Baldwin, allegedly at her own expense, sent Rolandson to Dr. Margolis, a frequent plaintiff's expert in this mesh litigation. *Id.* at 42-44, 54. Although she asserted "it was not [her] intention to serve a report from him[,]" Ms. Baldwin also rebuffed opposing counsel's description of Dr. Margolis as a treating physician, instead describing him as a consulting expert. *Id.* at 42, 54.

When Dr. Margolis purportedly identified a piece of exposed mesh, Ms. Baldwin first sent Rolandson to her treating physician, Dr. English, and then to Dr. Towers. *Id.* at 54-55. Ms. Baldwin also said she served Dr. Margolis's reports because she has "never

dealt with this situation before" of an expert excising and discarding mesh during an examination and "felt that we might need to replace [Dr. Towers] altogether." *Id.* at 45-46. She did not explain why, if that was her reason, she served Dr. Margolis's general expert report on the TVT device along with his case specific report, as Dr. Towers had not provided a general expert report in this case. Nor did she square this purported rationale with her correspondence to Ms. Van Steenburgh, which both affirmed her intent "to use both [Dr. Margolis and Dr. Towers] at trial," and took the position that this Court's order set "no limits on expert reports or designations," Van Steenburgh Decl. Ex. K, a position she took again in her brief to this Court.

Finally, as to Dr. Towers's examination, Ms. Baldwin reiterated that she only learned of the excision from her client the morning of Dr. English's deposition. Hr'g Tr. 43. She further asserted she did not ask Dr. Towers to remove any mesh and was shocked when she learned he had done so. *Id.* But, again, Ms. Baldwin offered no explanation why she did not inform Ms. Van Steenburgh of Dr. Towers's failure to preserve the mesh when they talked before the deposition. Nor did she say why she did not mention this important detail to defense counsel until she served Dr. Towers's report, two weeks after she learned of the excision and over a week after Ms. Van Steenburgh directly asked about preservation. However, Ms. Baldwin stated Plaintiff did not oppose striking those portions of Dr. Towers's supplemental report discussing the erosion. *Id.* at 44-45.

## ANALYSIS

This is not a difficult motion to resolve. The MDL court set expert discovery deadlines and limits that this Court did not alter. Ms. Baldwin subsequently learned her firm made a serious, though correctable, mistake by failing to serve a timely general

11

expert report regarding one of the devices at issue in this case. However inadvertent an error that may have been, Ms. Baldwin's subsequent conduct was plainly advertent— contravening court orders and warranting all the relief Defendants request in their motion.

## I.    Legal Standard

Rule 26 of the Federal Rules of Civil Procedure requires a party to disclose the identity of any expert witness it may use at trial, including the expert's written report. Fed. R. Civ. P. 26(a)(2)(A)-(B). The Rule bestows broad discretion upon the district court, providing that a "party must make these [expert] disclosures at the times and in the sequence that the court orders." *Id.* at 26(a)(2)(D). Lest that discretion be unclear, Rule 16(b), which governs the issuance of scheduling orders, expressly gives the district court power to both "modify the timing of disclosures under Rule 26(a)" and otherwise "modify the extent of discovery[.]" *Id.* at 16(b)(3)(B); *see also In re Baycol Prods. Litig.*, 596 F.3d 884, 888 (8th Cir. 2010) ("District courts have broad discretion in establishing and enforcing deadlines and in maintaining compliance with discovery and pretrial orders.").

Generally, when a party "fails to obey a scheduling or other pretrial order[,]" a "court may issue any just orders," including those listed in Rule 37 for enforcing discovery orders. Fed. R. Civ. P. 16(f). When a party violates the scheduling order by serving an untimely expert report, the party has also violated Rule 26 and the district court has similarly "wide discretion to fashion a remedy or sanction as appropriate for the particular circumstances of the case." *Wegener v. Johnson*, 527 F.3d 687, 692 (8th Cir. 2008); *cf. Trost v. Trek Bicycle Corp.*, 162 F.3d 1004, 1008 (8th Cir. 1998) (explaining that "failure to disclose in a timely manner is equivalent to failure to

12

disclose"). In such cases, Rule 37(c) provides a default rule to "exclude the information or testimony as a self-executing sanction unless the party's failure to comply is substantially justified or harmless." *Wegener*, 527 F.3d at 692; Fed. R. Civ. P. 37(c) advisory committee notes to 1993 amendment (describing Rule 37(c) as an "automatic sanction" not requiring a motion). The Eighth Circuit has directed courts crafting discovery remedies to "consider, *inter alia*, the reason for noncompliance, the surprise and prejudice to the opposing party, the extent to which allowing the information or testimony would disrupt the order and efficiency of the trial, and the importance of the information or testimony." *Wegener*, 527 F.3d at 692.

## II.    Dr. Towers

The Court turns first to Dr. Towers's supplemental report. At the motion hearing, Ms. Baldwin withdrew Plaintiff's opposition to Defendants' request that the Court strike the portions of the supplemental report discussing the excision and preventing Dr. Towers from testifying regarding the same. Hr'g Tr. 44-45. This remedy strikes a fair balance. Dr. Towers plainly violated the MDL court's order regarding mesh preservation, an order of which he either knew or of which he was not informed. Defendants are clearly prejudiced by not being able to examine the excised material themselves. Therefore, the Court orders that all references by Dr. Towers to the excised mesh will be stricken form his report and no reference to his purported observations will be allowed.

Nonetheless, the Court is displeased by the sequence of events. Accepting as true Ms. Baldwin's protestation that she did not tell Dr. Towers to remove any mesh, she had an affirmative obligation to inform Dr. Towers of the preservation protocol. Such a reminder is all the more apt when, by Ms. Baldwin's own account, Ms. Rolandson was

in pain and another doctor had purportedly spotted an erosion that could have been the source of her pain. As Ms. Baldwin argued in Plaintiff's brief, "Dr. Towers did what any doctor in his situation would try to do" by attempting to alleviate his patient's suffering. Pl.'s Resp. Opp'n 16, Dkt. No. 27. If it is self-evident that Dr. Towers had an obligation to help Ms. Rolandson if he could, then Ms. Baldwin, who knew of the potential erosion when she sent her client to several physicians, had an obligation to alert each doctor to the need to preserve any excised material.

Even if Dr. Towers had never previously excised and preserved mesh under the MDL court's protocol, common sense, if nothing else, counsels against simply discarding the excised material. But, most importantly, Ms. Baldwin has not offered any justification for why she waited to be candid with the Defendants and this Court about Dr. Towers' violation of the MDL Court's preservation order. Whatever error Dr. Towers made, Counsel's failure to deal with the issue in a timely and forthright manner only exacerbated the problem.

## III.    Dr. Elliott and Dr. Margolis

Without question, Ms. Baldwin disclosed both Dr. Elliott and Dr. Margolis as experts well after the time to do so had passed. Almost a year before this case returned from West Virginia, the MDL court set a deadline in Pretrial Order #303: Wave 8 plaintiffs had until July 13, 2018 to disclose their experts, not to exceed five in total. Van Steenburgh Decl. Ex. A, at § A. Plaintiff's counsel initially complied with this order, disclosing five experts on June 8, 2018. Over ten months later, this matter returned to this District. At the Court's status conference, Ms. Baldwin made no suggestion that she intended to seek relief from the MDL court's Pretrial Order #303, much less indicate she would engage in "self-help" by disclosing new expert reports that violated Pretrial Order

14

#303. The subsequent disclosures, over a year after the deadline, were neither substantially justified nor harmless.

### A.    No substantial justification

In Plaintiff's brief, Ms. Baldwin argues that this Court's September 10, 2019 Scheduling Order replaced the MDL court's expert discovery orders entirely and the new disclosures were therefore timely because they were served before December 31, 2019. Ms. Baldwin wisely abandoned this argument by the time of the hearing. Still, a genuine but mistaken belief about the disclosure deadline might justify the untimeliness, so the argument cannot go unaddressed, despite its disingenuity.

The plain language of the Order alone forecloses Ms. Baldwin's interpretation. The Order expressly notes the time this matter spent with the MDL and that "only limited discovery is left to be completed: expert medical examinations and depositions of certain medical experts, family, and friends of Plaintiff's." Sept. 10, 2019 Order. The Order also provides only three deadlines: one for "all discovery," one for "all motions," and a trial ready date. *Id.* If the Order had modified any of the already-passed expert disclosure deadlines or otherwise altered the scope of permitted discovery, the Court would have explicitly included such a modification.

Not only was this Court's Order clear on its face, Ms. Baldwin was part of the preceding status conference and knew the context of the Order. To put it mildly, it is disingenuous to say the parties communicated a broad need for additional general expert disclosures. Ms. Baldwin herself proffered the view that "it looks like what are called generic reports have been served . . . . What it appears hasn't been done in the MDL is a medical examination by either Plaintiff or Defense experts . . . . We'd request a time period *to do individual examinations, medical examinations, by Plaintiff's experts*

15

so the report (inaudible), which has been customary in all of these transnational [sic] mesh litigations." Status Conference Tr. 4 (emphasis added). When asked if Plaintiff had any other discovery needs, Ms. Baldwin replied, "I don't anticipate anything beyond that, no." *Id.* at 4-5. In Plaintiff's brief, Ms. Baldwin suggests the Court, having heard these comments, intended to throw out much of the hard work done by the MDL court: "First, this Court already ruled that additional discovery was appropriate, including additional expert reports, if disclosed by December 31, 2019." Pl.'s Resp. Opp'n 6, Dkt. No. 27. This argument is not only wrong, it is knowingly wrong. *See* Fed. R. Civ. P. 11(b)(2).[5]

## B.    The Harm

Ms. Baldwin alternatively argues no harm befell Defendants by her untimely disclosures. That is so, she reasons, because (1) as to the general expert reports, Defendants knew this case involved the Prolift and TVT device and have seen both experts and their reports in other cases, and (2) any prejudice to Defendants is *de minimis* given this case does not have a date certain for trial and defendants can depose the experts. This argument is unpersuasive.

Viewed solely through the lens of this individual case, Defendants face prejudice from the untimely disclosures. MDL Pretrial Order #303, as is commonly done, staggered the expert disclosures: plaintiffs disclosed first, defendants then had one month to disclose their experts in response, and plaintiffs had a short time to disclose rebuttal experts. Van Steenburgh Decl. Ex. A, § A. By disclosing new experts after *all*

---

[5] In addition, Ms. Baldwin's statement when she served the general report of Dr. Elliot that the report had been inadvertently omitted from the disclosure indicates a knowledge of the MDL order and the need to comply with it. Her later justification that this Court's order was unclear or somehow modified the MDL Order is difficult to reconcile with this earlier statement, to say the least.

expert disclosures were due, Ms. Baldwin denied Defendants the opportunity they would have otherwise had to make strategic decisions about which experts to disclose in response to Plaintiff's experts. This strategic decision-making opportunity is not merely hypothetical, for as Defense counsel noted at the hearing, Dr. Elliott practices at the Mayo Clinic in Rochester, Minnesota. Hr'g Tr. 37. Irrespective of whether Ms. Baldwin factored this into her decision to disclose Dr. Elliott when she realized she needed a Prolift expert, Defendants would have considered it when choosing their general experts for this case had they known (as contemplated by the MDL order) that plaintiff intended to proffer Dr. Elliott.

Further, without intervention by this Court, at least one clear prejudice would remain: Rolandson would have seven experts but Defendants would have only have five. As of the date of this Order, all deadlines set by this Court's September 10 Order, including the April 6 trial ready date, have now passed. The mere remoteness of trial does not change the fact that the Court can only fix the harm by reopening discovery to give Defendants an opportunity to respond to these new experts. As the Ninth Circuit has opined, "Such modifications to the court's and the parties' schedule supports a finding that the failure to disclose was not harmless." *Hoffman v. Construction Protective Servs., Inc.*, 541 F.3d 1175, 1180 (9th Cir. 2008). Although the harm would be greater had Defendants never seen the general expert reports at issue before, it does not follow that the untimely disclosures were harmless in this particular case.

Ms. Baldwin indicated at the hearing that she would not call one or two of her other, timely disclosed experts, so the Court could ameliorate any prejudice from the number of experts by, in effect, substituting them. Besides being a far cry from her original position that she could call any expert she wanted, this route puts the cart

before the horse. That is, Ms. Baldwin is merely suggesting a gentler remedy than Rule 37 contemplates. In other circumstances, this may be an appropriate solution. As explained later, it is insufficient in the present case.

The parties' interests in the present case are not the only source of harm to consider. Shifting the focus of this analysis to that of the entire MDL, a different harm becomes apparent. The ostensible goal of any MDL is to "eliminate duplicative discovery; prevent inconsistent pretrial rulings[;] . . . and conserve the resources of the parties, their counsel, and the judiciary." *In re Uber Techs., Inc., Data Sec. Breach Litig.*, 304 F. Supp. 3d 1351, 1353 (J.P.M.L. 2018). This gained efficiency, which benefits all parties, is not costless: when pretrial proceedings for thousands of cases across the country are consolidated in front of one court, litigants (and the courts) sacrifice some of the flexibility they may normally expect. *E.g.*, *Freeman v. Wyeth*, 764 F.3d 806, 809-10 (8th Cir. 2014) ("The MDL judge must be given 'greater discretion' to create and enforce deadlines in order to administrate the litigation effectively."). When a case returns from an MDL, the home district court must be able to rely upon the work that got the case to the home stretch. As the MDL court that oversaw this case explained,  this process only succeeds when counsel collaborate with the Court to fashion workable pretrial procedures—and then adhere to them. *Drake v. Ethicon, Inc.*, 2016 WL 1621954, at *2 (S.D. W.Va. Apr. 21, 2016).

In this sense, the untimely disclosures are not harmless. As the remaining cases in the MDL return to their home districts, both Defendants and the courts must be able to rely upon the work already done over the past several years, barring truly unique circumstances. Otherwise, any hard-won efficiency, in this case and in the entire MDL,

may be lost. Because the late disclosures were neither justified nor harmless, Defendants are entitled to at least some relief.

### C.    The remedy

That leaves only the question of an appropriate remedy for the untimely disclosures. As to Dr. Margolis, the answer is clear. Ms. Baldwin acknowledged during the motion hearing that she did not originally intend to serve an expert report from Dr. Margolis, and only did so when she thought she might need to replace Dr. Towers. Hr'g Tr. 42, 45-46. Because Dr. Towers remains an expert witness in this case, aside from his opinions regarding the purported erosion and excision, there is no need for Dr. Margolis as an expert. Both of his reports are stricken in their entirety and Plaintiff may not call Dr. Margolis to testify at trial or any hearing.

Dr. Elliott's situation is slightly different, but his report must still be stricken. Ms. Baldwin stated (for the first time only at the motion hearing)[6] that she disclosed Dr. Elliott because she realized she was without an expert report regarding the Prolift device. Expert testimony regarding one of the two devices Rolandson had implanted is, without question, an important part of Plaintiff's case. Discovery mistakes happen and the Federal Rules of Civil Procedure contemplate a solution. Had Ms. Baldwin promptly raised the issue in a candid and above-board fashion after learning of her firm's error, this Court could have considered whether good cause existed to amend the scheduling order in a tailored manner. Or, had she conferred candidly with opposing counsel, she may have found willingness to reach a resolution without any motion at all.

But Ms. Baldwin did not promptly bring the issue to either Defendants' or this Court's attention. Instead, she unilaterally disclosed a new expert over a year after the

---

[6] The Court learned far too much information for the first time during the hearing.

deadline and in excess of Plaintiff's allotted experts under Pretrial Order #303. Any time Defendants' counsel asked about the timing and number of expert disclosures, Ms. Baldwin dissembled, obfuscated or responded combatively. Only when she appeared before this Court in person did Ms. Baldwin abandon these tactics, instead asking the Court to understand that "the dog ate her homework."

Still, leaving Ms. Rolandson entirely without an expert to testify on the Prolift device would punish her for the shortcomings of her counsel. At the hearing on this motion, Defense counsel informed the Court that one of Ms. Rolandson's properly disclosed experts, Dr. Rosenzweig, has authored a report on the Prolift device, and that his report on a third device included opinions applicable to the Prolift. Defendants have—in the spirit of candor and fairness this Court expects—agreed that Ms. Rolandson may rely upon both these reports. The Court therefore strikes the expert report of Dr. Elliott in its entirety. Ms. Rolandson may still present her Prolift claims on their merits through the previously disclosed expert opinions of Dr. Rosenzweig.

## IV.   Sanctions

As the preceding discussion makes clear, the present motion is not simply a matter of untimely disclosures or a momentary lapse of judgment by Dr. Towers. In the face of Ms. Baldwin's lack of candor with this Court and with opposing counsel, additional sanctions are appropriate. The Federal Rules of Civil Procedure give this Court the power to sua sponte "issue any just orders . . . if a party or its attorney . . . fails to obey a scheduling or other pretrial order." Fed. R. Civ. P. 16(f)(1)(C). "Instead of or in addition to any other sanction, the court must order the party, its attorney, or both to pay the reasonable expenses—including attorney's fees—incurred because of any noncompliance with this rule, unless the noncompliance was

substantially justified or other circumstances make an award of expenses unjust." *Id.* at 16(f)(2).

Plaintiff's counsel shall pay the reasonable expenses incurred by Defendants in bringing a motion they should have never needed to bring. Although Defendants sought more tailored relief under Rule 26, much of the underlying chicanery highlighting the need for greater sanctions only became apparent after Defendants filed their motion. Had this been merely an unreasonable interpretation of court orders, awarding expenses may be unjust. But the record clearly demonstrates that Ms. Baldwin actively disobeyed Pretrial Order #303, and tried to conceal it.

Consistent with the Court's original order on this motion, Defendants submitted affidavits detailing the costs and attorney's fees incurred through the first hearing, totaling $14,231.62. *See* Dkt. Nos. 53-55. After careful review, the Court finds the total expenses set forth in the affidavits reasonable, particularly as they do not include the travel costs and attorney's fees from the second hearing necessitated by Ms. Baldwin's calendaring mishap. Plaintiff's counsel—not Plaintiff—shall therefore pay Defendants' reasonable expenses incurred with respect to this motion.

## CONCLUSION

Managing litigation discovery in even the simplest case is difficult: The Court can set boundaries, but it cannot be everywhere at once and must rely on the parties and counsel to do their part in good faith. When the case is an MDL, the complexity is exponentially greater. The benefit of an MDL depends upon strict enforcement of deadlines and orders, lest the ostensible efficiency of the process be lost. When a case is remanded from an MDL to its home district, it is especially important that the home

Court enforce the Pretrial Orders that have governed the MDL process unless there is a very good, case-specific justification for not doing so.

In this case, the MDL court set clear rules for discovery, including expert disclosure deadlines and a detailed preservation protocol. After she learned her firm failed to disclose a critical expert report, Ms. Baldwin faced a choice: deal with the issue in a forthright and candid manner and seek modification of the Pretrial Order, or dissemble, hide the facts, and, ultimately, attempt to blame the Court for her own mistakes. She faced the same choice after she learned her own expert had destroyed evidence in violation of the preservation protocol. Both times, Ms. Baldwin chose to avoid being fully candid until it was clear there was no other way out.

**ORDER**

For the reasons stated above, IT IS HEREBY ORDERED that:

1.  Defendants' Motion to Strike [Dkt. No. 17] is GRANTED:

    a.  The general expert reports of Dr. Daniel Elliott and Dr. Michael Margolis are EXCLUDED from this case and Plaintiff may not call either expert to testify at trial or any hearing.

    b.  The case specific expert report of Dr Michael Margolis is EXCLUDED from this case and Plaintiff may not call Dr. Margolis as an expert to testify at trial or any hearing.

    c.  All portions of the supplemental case specific report of Dr. Geoffrey Towers pertaining to any treatment of Plaintiff on October 22, 2019, specifically his observation of mesh exposure, his excision of mesh, and his purported identification of the mesh manufacture from the excised specimen are

EXCLUDED from this and Dr. Towers may not testify about said matters at trial or in any hearing.

2.      Within 30 days of this Order, Plaintiff's counsel shall pay Defendants $14,231.62, which this Court has determined to be the reasonable expenses, including attorney's fees, incurred in bringing this motion to correct Plaintiff's failure to obey pretrial orders.

Dated: April 30, 2020                          s/ David T. Schultz
                                               DAVID T. SCHULTZ
                                               U.S. Magistrate Judge